### THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNIVERSITY HOSPITALS | : | |
| CLEVELAND MEDICAL | : | |
| CENTER | : | |
| 3605 Warrensville Center Road | : | |
| Shaker Heights, OH 44122, | : | |
| | : | CASE NO. _____ |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE _____ |
| | : | |
| Nicholas Krudy | : | |
| 14720 County Line Road | : | |
| Chagrin Falls, Ohio 44022 | : | |
| | : | |
| Defendant. | : | |

### COMPLAINT FOR JUDICIAL DECLARATION,
### INJUNCTIVE RELIEF, AND TEMPORARY RESTRAINING ORDER

Plaintiff University Hospitals Cleveland Medical Center ("Plaintiff" or "UH"), by and through its undersigned counsel, and for its Complaint for Judicial Declaration, Injunctive Relief, and Temporary Restraining Order (the 'Complaint') against Defendant Nicholas Krudy ("Defendant" or "Krudy"), states as follows:

### PARTIES

1.      Plaintiff is an acute care hospital that operates within University Hospitals Health System's ("UHHS") healthcare system.

2.      UH is a teaching hospital that provides medical education and training to future and current health professionals.

3.      Relevant to this lawsuit, UH operates the Case Western Reserve University/University Hospitals Cleveland Medical Center Psychiatry Residency program (the "Residency Program").

1

4.      Defendant is a resident of Chagrin Falls, Ohio.

5.      Defendant is a former resident in the Residency Program.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiff seeks declaratory and injunctive relief against Defendant pursuant to 28 U.S.C. § 1651 and 28 U.S.C. § 2201.

7.      The Complaint is proper based on this Court's prior decision in *Conley v. Smith*, Case No. 5:08CV622, 2009 WL 5955989 (N.D. Ohio March 6, 2009).

8.      A current case or controversy exists because Defendant is a vexatious litigator who has filed numerous charges and lawsuits against UH and UH's employees and agents.

9.      Defendant has continued to file charges and lawsuits despite the fact that Plaintiff ceased working for UH in 2021.

10.     Defendant has threatened to file yet another lawsuit and this filing is designed to require Defendant to get approval from this Court before filing further lawsuits or charges against UH or UH's employees or agents.

11.     Venue is proper in this Cout pursuant to § 1391 because the events giving rise to this lawsuit occurred in this District.

## KRUDY'S DISCHARGE FROM THE RESIDENCY PROGRAM

12.     UH has operated the Residency Program at all times relevant to the Complaint.

13.     Defendant was hired by UH in July of 2019 as a Program Year 1 in the Residency Program.

14.     Defendant was licensed to practice medicine while in the Residency Program.

15.     Defendant no longer has an active license to practice medicine in Ohio.

2

16.     Upon information and belief, Defendant is no longer involved in medicine and has ceased applying for residency programs.

17.     The Program Director for the Residency Program during Defendant's tenure was Cathleen Anne Cerny-Suelzer, M.D. ("Dr. Cerny").

18.     The Associate Program Director, Adult Psychiatry for the Residency Program during Defendant's tenure was Andrew Warner Hunt, M.D. ("Dr. Hunt").

19.     Defendant's performance in the Residency Program was extremely poor.

20.     Defendant acted in an unprofessional manner in the Residency Program.

21.     Defendant's attendance was erratic in the Residency Program.

22.     Defendant's treatment of peers, patients and staff was inappropriate.

23.     The Ohio Civil Rights Commission (the "OCRC"), following an extensive investigation of Defendant's employment history in the Residency Program, concluded that Defendant was not qualified for the Residency Program. A copy of the August 24, 2023 OCRC Letter of Determination is attached hereto as Exhibit 1.

24.     Specifically, the OCRC held:

> "Charging Party was not qualified for his position due to the numerous concerns raised about his performance to include his interpersonal communications, time management, ability to take instructions, poor judgment and deviation from safe clinical practice."

25.     Defendant's performance issues arose within the first month of Defendant's tenure in the Residency Program.

26.     The performance issues were not only recognized by the Residency Program management, but also Defendant's peers.

27.     In March 2020, some of Defendant's peers met with Defendant to discuss their concerns related to Defendant's unprofessional behavior.  After this meeting, the peers that met

with Defendant sent an email to the Chief Resident reporting that colleagues had expressed concerns throughout the year regarding Defendant's professionalism, respect and accountability. One of the greatest of these concerns was whether Defendant was getting adequate sleep, or if something was happening in Defendant's personal life that would benefit from the support of others.

28.     On April 1, 2020, the Chief Resident received an email from peers of Defendant. The peers were expressing concerns about Defendant's general accountability, tardiness and responsiveness.

29.     The peers had spoken to others that had worked directly with Defendant, and those people voiced similar concerns.  Ultimately, his peers wanted to make certain that Defendant was doing well and that there were no health or safety concerns.  It was a common complaint among colleagues that Defendant was hard to get ahold of when he was on-call.  The consensus of his colleagues was that he was difficult to wake up when he was on call.  There were numerous complaints that when staff tried to reach him, he would not answer the phone.

30.     Dr. Cerny and Dr. Hunt discussed these concerns with Defendant at this meeting, as well as concerns that had been raised by others about collegiality with colleagues.

31.     On April 2, 2020, Dr. Cerny received an additional concern from a peer of Defendant regarding Defendant's arrival time on the unit.  She was informed that Defendant would sometimes show up late to the unit without any prior notice of being tardy.  There were additional frustrations and concerns expressed by multiple trainees as well as nursing staff regarding Defendant's availability, responsiveness, and acting as a team player on the unit.

32.     In response to these concerns, Dr. Cerny reached out directly to a few of Defendant's peers in an effort to better understand their concerns.  Those peers very much wanted

4

Defendant to receive feedback in a constructive way so that he could improve in his career. One of the peers observed a lack of professionalism throughout the program year in his discourse with fellow residents. Defendant was noted to be disrespectful or dismissive of the concerns, perspectives or ideas of fellow colleagues, which can make group discussions and collaboration difficult or uncomfortable. The peers noted many positive experiences with Defendant throughout the year, and felt that he had a lot to contribute to the program. They expressed that Defendant was a very talented person with a lot of wisdom and could be a benefit to the system, but they did have concerns that felt might warrant some discussion.

33.     On June 17, 2020, Dr. Cerny received an email from a nurse regarding Defendant. This nurse expressed concerns on behalf of several nurses regarding an inability to locate Defendant when he was on duty. The nurse cited specific examples of times the staff had attempted to locate Defendant -- sometimes for as much as four hours and with the assistance of other Residents – and they were unable to locate him. One of these times, Security was called, and Defendant was eventually found asleep in a room after security had to open up the door. Defendant then fell back asleep, and again, staff had to attempt to locate him. The nursing staff had also indicated that Defendant was dismissive of most staff members with the exception of a select few. It was also noted that Defendant, more than other classmates, struggled to complete work and leave at a reasonable time post call.

34.     The Clinical Competency Committee ("CCC") reviews the work performance of residents in the Residency Program.

35.     On June 17, 2020, the CCC met and finalized the Resident milestones. Defendant was marked as "conditional upon approval" for professionalism. There was a specific note on his recommendation that stated:

"Committee has concerns. Committee discusses concerns regarding chronic tardiness to service and call. Concerns regarding lack of accountability when on call and collegiately with all members of treatment team. Concerns have not improved after feedback and discussion and has remained consistent during the span of the academic year. PD states she will schedule a meeting at a later date to discuss committee concerns with Resident."

36.     Due to the peer concerns regarding Defendant's ability to complete the essential functions of his position, Defendant was referred to the Employee Assistance Program (the "EAP").  The purpose of the referral was to verify that medical issues were not impacting Defendant's work performance and, if there were medical issues, to verify that Defendant was accommodated.

37.     The EAP program is confidential – Residency Program management only learned that Defendant completed the EAP referral and whether Defendant needed accommodations. The EAP program is confidential.  Residency Program management would only learn if Defendant had completed the EAP referral and whether Defendant needed accommodations.

38.     UH has learned in litigation that Defendant had medical impairments that may have required accommodations that Defendant failed to disclose to UH during the hiring process or during his employment.

39.     Although aimed at helping Defendant successfully complete the Residency Program, the EAP referral did not help to improve Defendant's work performance.

40.     Rather, on February 23, 2021, five attending physicians employed by the Veterans Administration (the "VA"), part of the Residency Program rotation, notified UH of serious concerns regarding Defendant's medical skills.

41.     The VA advised UH that Defendant was not permitted to rotate to the VA due to patient concerns.

42.     The VA letter raised highly concerning conduct and it could have resulted in Defendant's discharge.

43.     The VA letter is attached as Exhibit 2.

44.     The VA letter concluded that Dr. Krudy's rotation at the VA would end in order to protect patients:

> "In view of the situations above, as well as other behaviors not addressed here, Dr. Krudy has demonstrated a pattern of poor judgment and a lack of understanding of his limitations as a resident-in-training.  He does not seek supervision when indicated.  He dismisses the instructions of consultants of those with much more experience.  Through the deficiencies in judgment and action mentioned above, Dr. Krudy had demonstrated that he is unfit for overnight call in the VA.  His lack of insight cannot be remedied.  In view of patient safety, the undersigned recommend that his overnight call duties be curtailed."

45.     The inability to rotate to the VA was grounds for the immediate termination of Krudy's employment with UH.

46.     However, rather than immediately terminating Dr. Krudy, the CCC placed Defendant on a Performance Alert and provided Defendant with the opportunity to agree to a Performance Improvement Plan (the "PIP") that would permit Defendant to agree to a new rotation and performance standards.

47.     During the PIP negotiations, UH continued to learn of attendance and performance issues with Defendant.

48.     Defendant did not cooperate during the PIP process.

49.     As with his interactions with peers and patients, Defendant was unprofessional and uncooperative during the PIP process.

50.     Defendant refused to accept that he had performance issues.

51.     Defendant refused to agree to the PIP requirements.

52.     Defendant refused to meet with Residency Program management to discuss the PIP.

53.     For a number of reasons, including Defendant's unprofessional conduct during the PIP process, Defendant's continuing work performance issues, the concerns raised by the VA physicians, and continuing peer complaints regarding Defendant's work performance, Defendant was discharged on April 23, 2021.

54.     Any resident would have been discharged for conduct similar to Defendant's conduct.

55.     Defendant was not qualified to be a resident in the Residency Program.

56.     Defendant's employment and discharge have been reviewed by numerous agencies and investigators.

57.     All of the agencies and investigators have concluded that Defendant was treated fairly, that Defendant's work performance was very poor, that Defendant was not qualified to be a resident, and Defendant's discharge was lawful.

## KRUDY'S POST-TERMINATION HARASSMENT OF EMPLOYEES

58.     While still a resident at UH, Krudy filed charges with the NLRB, EEOC and OCRC alleging that the EAP referral was unlawful and that he was being discriminated and retaliated against.

59.     The charges filed during Krudy's employment were dismissed.  In fact, Krudy admitted that the National Labor Relations Board (the "NLRB" or "Board") investigated the charge filed while Krudy was an employee and requested that Krudy withdraw the charge because it lacked merit.

60.     Following his discharge, Krudy essentially changed his profession to a lawyer in order to focus his sole attention to weaponizing the legal system to harass UH, its agents, and

employees and to force it to incur significant costs in defending his baseless claims over the last four plus years.

61.     Krudy has been focused on exacting revenge against UH from the date of his first NLRB filing, January 30, 2021 through the date of this filing.

62.     Krudy has posted on Reddit about UH, attended Zoom sessions where the Residency Program was a participant, continued to contact UH employees, and has harassed UH employees and agents in an unrelenting fashion.

63.     Krudy has been singularly focused on UH from April 23, 2021 through the date of this filing.

64.     Krudy learned that when position statements were submitted by UH in response to his charges that he received a copy of the position statement with exhibits for review and response to the investigator.

65.     Krudy systematically identified employees of UH who provided UH with negative information regarding Krudy's work performance and he contacted each of these employees with the intent to change their testimony.

66.     Krudy harassed, threatened and misrepresented facts to these employees in an unlawful attempt to change their testimony or to get the employee to cease being willing to assist UH in defense to Krudy's claims.

67.     Krudy's communications with UH's employees disrupted the work environment and placed patient care at risk.

68.     Krudy's communications with UH's employees resulted in complaints to UH regarding the harassment and threats of lawsuits asserted by Krudy against UH's employees.

69.     Krudy's communications were meant to intimidate, harass, and threaten Plaintiff and Plaintiff's employees with respect to his pending Agency Charges.

70.     Specifically, Krudy contacted these individuals to intimidate, threaten, and harass them to either assist him with his pending Agency Charges and/or to refrain from assisting Plaintiff in responding to the Agency Charges.

71.     Krudy's threats were explicit:  He threatened to file charges, lawsuits, and board complaints against individuals who did not comply with his demands.

72.     Krudy's threats were explicit and made clear that he would file litigation against individuals assisting Plaintiff.

73.     For example, Krudy told a former resident the following: "Please let me know where I can serve you as a defendant in the pending litigation."

74.     As another example, Krudy told one of Plaintiff's employees the following:

> "Additionally, as it appears some people are under the impression that Ohio law did away with individual liability in employment law and the ORC is not updated online, you should read HB 352 form last session noting very carefully the remarks about Genaro. The lawmakers only removed individual liability for some causes of action.  Notably retaliation and intimidation still carry it.
> Highly suggest reviewing with your own attorney…"

75.     Krudy also sent Dr. Cerny many communications in an attempt to threaten and intimidate her from assisting Plaintiff with the Agency Charges.

76.     When individuals refused to cede to Krudy's demands, Krudy intensified his harassing conduct.

77.     For example, Krudy would text Plaintiff's residents unsolicited messages in an attempt to threaten the residents.

78.     Krudy would threaten to provide Plaintiff's employees' personal contact information to "federal agents."

79.     At one point, long after his termination and even though he was clearly not a candidate for rejoining the Residency Program, Krudy obtained the login credentials for Plaintiff's residency program fair and logged into the fair.

80.     The residency fair was for prospective residents.

81.     Although prospective residents were supposed to shuffle between sessions, Krudy remained in Dr. Cerny's session for several hours in order to intimidate Dr. Cerny.

82.     Krudy also likened one of Plaintiff's employees as a Nazi sympathizer due to his refusal to cede to Krudy's demands with respect to the Agency Charges:

> "I remember we talked about ethics.
>
> I don't think got into a discussion about it given the circumstances, but typically boards and societies for independent professionals in medicine or mental health do not respect the 'Eichmann defense'.
>
> [Krudy inserted an attachment of Adolf Eichmann]."

83.     Krudy was advised on numerous occasions to only communicate with UH through outside counsel.  Krudy refused the requests and continued to directly communicate with employees.

84.     In addition to harassing UH employees, Krudy has actively sought to interfere with UH's outside counsel's relationship with UH.

85.     Krudy has sought to get UH's outside counsel disciplined by their law firm employers.

86.     Krudy has sought to get UH to terminate its relationship with UH's law firm.

87.     Krudy has publicly disparaged UH, UH's counsel, and UH's employees.

88.     Krudy's conduct is unreasonable, unlawful and highly inappropriate.

89.     Krudy's harassment of UH and UH's agents caused UH to seek and obtain a protective order in this Court.

90.     Krudy's harassment of UH and UH's agents caused UH to seek an order from the NLRB to require Krudy to act appropriately during NLRB proceedings.

91.     Krudy has not been employed by UH for nearly four years, but his focus in life continues to be UH.

### KRUDY'S CHARGES

92.     Krudy's most effective means for harassing Plaintiff has been through the filing of dozens of frivolous charges and lawsuits stemming from his prior employment with Plaintiff and Plaintiff's defense of Krudy's many charges and lawsuits.

93.     To date, Krudy has filed over 40 charges and amendments with the Equal Employment Opportunity Commission (the "EEOC"), the OCRC, the Board, the Department of Labor (the "DOL"), the Accreditation Council for Graduate Medical Education, the Department of Health and Human Services, and a Title IX charge (the "Agency Charges").

94.     A list of the Agency Charges is attached hereto as Exhibit 3.

95.     The Agency Charges require UH to unnecessarily spend financial and manpower resources.

96.     The Agency Charges are frivolous and filed for the sole purpose to harass UH and UH's employees and agents.

97.     The Agency Charges often repeat charges that have been fully investigated and dismissed.

98.     The OCRC charges have been dismissed on the merits.

99.     One of the OCRC charges that addressed Krudy's UH employment was appealed to a Commission Hearing in Columbus, Ohio.

100. The investigator had to present the evidence to the Commission as part of Krudy's appeal.

101. The investigator advised the Commission that based on the OCRC's investigation that Krudy was not qualified to be a resident with UH.

102. The investigator supported the qualifications statement with evidence to the Commission.

103. Through the filing of his many Agency Charges, Krudy learned that the NLRB charges could be filed electronically without costs to Krudy.

104. Krudy has utilized the NLRB charge filing process to file numerous charges from 2021 to the present date.

105. Krudy's NLRB filings are meant to harass UH and UH's employees and agents.

106. UH has unnecessarily expended financial and human resources on responding to Krudy's many NLRB charges.

107. The vast majority of the Agency Charges address post-employment activities.

108. The post-employment activities were UH's responses to Krudy's wrongful actions and UH's defense of the Agency Charges.

109. For example, UH sought a protective order in federal court, that was granted, and Krudy filed an NLRB charge in response.

110. Similarly, Krudy participated in a Sixth Circuit mediation, and he threatened to file NLRB charges against the mediator based on the confidentiality obligations of the mediator.

111. Krudy filed a charge with the NLRB against UH that included allegations that UH was retaliating against him by not waiving the confidentiality associated with the Sixth Circuit's mediation process.

112.    The allegations as to Krudy's employment were conflicting and ever changing.

113.    Krudy has alleged, in various different court pleadings and Agency Charges, that he was discharged due to his sex, disability, genetics, and purported protected activities.

### KRUDY'S TWO FEDERAL LAWSUITS

114.    In addition to the Agency Charges, Krudy has also filed two federal lawsuits.

115.    The first lawsuit was filed anonymously by Krudy on August 15, 2022 and is captioned *John Koe v. University Hospitals Health System, Inc.*, Northern District of Ohio No. 1:22-cv-01455 (the "First Lawsuit").

116.    The second lawsuit was filed anonymously by Krudy on January 4, 2024 and is captioned *John Koe v. University Hospitals Health System, Inc., et al*, Northern District of Ohio No. 1:24-cv-00024 (the "Second Lawsuit") (the First Lawsuit and Second Lawsuit are collectively referred to as the "Federal Lawsuits").

117.    The Second Lawsuit named nine defendants: (1) UHHS: (2) UH; (3) UH's inside-counsel; (4) UH's outside counsel, David Campbell; and (5) five individuals employed by UH, one of whom is Dr. Cerny-Suelzer, who Krudy has targeted his vendettas against.

118.    The First Lawsuit was filed anonymously.  However, in 2024, Krudy filed a notice in the federal court that he was now willing to proceed under his real name.

119.    Similarly, the Second Lawsuit was also filed anonymously.  However, after filing the Second Lawsuit, Krudy advised the federal court that he was now willing to proceed under his real name.

120.    Although Krudy did not disclose his name in the initial filing of either the First or Second Lawsuits, Krudy identified by name many individuals that he accused of wrongful conduct.

The Second Lawsuit named a series of individuals as defendants while Krudy sought to proceed anonymously.

121. Once the First Lawsuit was filed, Krudy sent emails to UH that disparaged UH's counsel.

122. Krudy's emails were meant to get UH to terminate UH's counsel.

123. Krudy's emails were knowingly false.

124. Krudy's emails were unlawful.

125. Krudy's emails disparaged UH's counsel.

126. Due to Krudy's emails, UH filed a motion for a protective order in the First Lawsuit.

127. A true and correct copy of the Motion and attachments is attached as Exhibit 4.

128. The Court granted UH's motion for a protective order in the First Lawsuit.

129. The First Lawsuit was dismissed by the federal court and Defendant was given the opportunity to refile in his name.

130. Defendant elected not to file the lawsuit in his name.

131. Rather, Defendant appealed the dismissal and the appeal was denied as to the dismissal of the lawsuit on the merits.

132. Defendant has continued to file motions in the First Lawsuit despite the fact that the lawsuit was dismissed in 2022 and the dismissal was affirmed by the Sixth Circuit Court of Appeals.

133. The Sixth Circuit Court of Appeals affirmed the dismissal of Krudy's First Lawsuit, but the Sixth Circuit Court of Appeals held that UH should seek a protective order through state court rather than the Federal Rules of Civil Procedure.

134. The protective order was no longer controlling in 2024.

15

135.    Upon the protective order no longer being controlling, Krudy again began his harassment of UH's counsel through emails to UH and counsel's employer.

136.    A second motion for protective order was filed with the NLRB.  A true and correct copy of the NLRB filing is attached as Exhibit 5.

137.    Krudy's 2024 conduct was highly inappropriate.

138.    Krudy's statements about counsel were untrue.

139.    Krudy's statements were intended to force UH to hire new counsel to respond to Krudy's Agency Charges and lawsuits.

140.    The Second Lawsuit was a repeat of the factual and legal issues that were dismissed in the First Lawsuit.

141.    The Second Lawsuit named UH employees and agents.

142.    The Second Lawsuit was dismissed on the merits.

143.    Following the dismissal, Krudy filed a post-judgment motion and an appeal.

144.    Two appeals are currently pending in the Sixth Circuit Court of Appeals.

## KRUDY HAS THREATENED TO FILE A THIRD LAWSUIT AND HE CONTINUES TO FILE AGENCY CHARGES

145.    Despite having two pending appeals, Krudy has threatened to file a third lawsuit.

146.    Despite the pending appeals and the dismissal of the First and Second Lawsuits on the merits, Krudy claims that he has the right to file a third lawsuit under the Ohio Savings Statute.

147.    Krudy has sent Plaintiff's counsel many emails concerning his proposed third lawsuit.

148.    The most recent emails concerning the filing of Krudy's proposed third lawsuit were sent beginning the week of February 17, 2025.

16

149.    Krudy concedes in his February 17, 2025, email that his third federal lawsuit arises out of the same allegations pled in the First Lawsuit and the Second Lawsuit:

> "In the interest of avoiding unnecessary multiplication of the proceedings prior to the decision in the appeal. (e.g. filing of the action in an Ohio court in accordance with R.C. 2305.19), I would like to propose a tolling agreement that would allow me a reasonable amount of time to recommence the action I attempted to commence in 1:24-cv-00024 (N.D. Ohio) (dismissed February 23, 2024) after the conclusion of the pending appeals in 24-3263 and 24-4035."

150.    Based on Krudy's threats, it is clear that he intends to file a third lawsuit.

151.    The Ohio savings statute does not apply to Krudy's claims and allegations.

152.    The allegations and claims set forth in the First Lawsuit and Second Lawsuit are untimely.

153.    Krudy cannot circumvent the pending First Lawsuit and Second Lawsuit by pleading those same allegations in a third lawsuit.

154.    A third lawsuit would be frivolous.

155.    A third lawsuit would be barred by res judicata.

156.    Krudy is also continuing to file Agency Charges.

157.    In 2024, Krudy filed a federal lawsuit and 5 Agency Charges.

158.    Krudy has filed several Board charges against Plaintiff and Plaintiff's attorneys in 2025 – including two in February, 2025.

159.    The most recent Agency Charges have been filed against UH's attorneys.

160.    The charges filed by Krudy in 2024 and 2025 have no relation to his prior employment with Plaintiff.

161.    The charges filed by Krudy in 2024 and 2025 are focused on the arguments and evidence presented by Plaintiff's attorneys in defending Plaintiff against Krudy's frivolous Agency Charges.

162.    In fact, Krudy has attacked Plaintiff's counsel and the law firms who employ Plaintiff's counsel in connection with prosecuting the Agency Charges.

163.    Krudy has attempted to have the law firms retained by Plaintiff terminate the employments of the attorneys representing Plaintiff in defending the Agency Charges and Federal Lawsuits.

164.    The substance of the charges filed by Krudy in 2024 and 2025 confirm that they do not address his prior employment with Plaintiff and, instead, focus Plaintiff's attorneys, Plaintiff's defenses in the Agency Charges and Federal Lawsuits, and allegations that did not arise until 2024 and/or 2025.

165.    To be sure, Krudy filed a charge with the EEOC on January 2, 2025 alleging that Plaintiff's attorney somehow discriminated against Krudy's disability by representing Plaintiff and defending it against Krudy's Agency Charges and Federal Lawsuits.

166.    Krudy filed a Board charge in July 2024 that alleged UH, through its attorneys, to have engaged in conduct with respect to witness testimony elicited through a hearing that had not yet been undertaken.

167.    Krudy then filed two charges on September 30, 2024.  Charge No. 08-CA-351674 has no bearing to Krudy's prior employment.

168.    Krudy alleges a violation with respect to UH's resident manual that happened allegedly dating back to July 2024 – three years after Krudy's discharge.

169.    The second September 30, 2024 Charge – charge No. 08-CA-351670 – also does not relate to Krudy's prior employment.

170.    Rather, the charge alleges that the protective order filed by Plaintiff in the Board Hearing somehow violated his rights.

171.    Krudy attributes this conduct to Plaintiff's attorneys: "[o]n or about July 29, 2024…by its unnamed counsel filed a motion for a Protective Order against Nicholas Krudy…"

172.    Krudy's December 31, 2024 Charge - Charge No. – again does not address Krudy's prior employment.

173.    Instead, this charge again raises allegations concerning Plaintiff's current policies.

174.    Krudy's February 6, 2025 charge – Charge No. 08-CA-359878 – raises a variety of allegations concerning Plaintiff's defense of Krudy's board charges and participation in a Board Hearing.

175.    The February 6, 2025 charge again raises allegations against Plaintiff's counsel.

176.    The February 6, 2025 charge first alleges that Plaintiff somehow interfered with Krudy's rights by complying with the ALJ's orders with respect to the submission of evidence and arguments with respect to the Board Hearing.

177.    The charge next alleges that Plaintiff violated Krudy's rights to cross-examining him during the hearing.

178.    Krudy further alleges that the briefing submitted by Plaintiff to the Board was "irrelevant, immaterial, and detrimental" and resulted in "[u]tter and make calumnies against him…", "[e]xpose him to contempt and hatred including through innuendo and rumor…", and "[d]amage his reputation and his employment prospects.

179.    Finally, Krudy's February 13, 2025 charge raises allegations concerning Dr. Cerny and her response to Krudy's harassing and threatening conduct in 2021.  Krudy's charge is time-barred on its face by more than three years.

180.    If Krudy is not declared a vexatious litigator and enjoined by this Court, Plaintiff, Plaintiff's employees, and Plaintiff's attorneys will forever be defending frivolous lawsuits and charges filed by Krudy.

181.    Krudy's conduct is intentional.

182.    Krudy's lawsuits, claims, and allegations have been and continue to be frivolous.

183.    To leave no doubt that Krudy's charges and lawsuits are frivolous, Krudy filed a charge with the Board *prior to the commencement of the Board Hearing*, that alleges Plaintiff and Plaintiff's attorneys engaged in unlawful conduct during the course of a hearing that was not set to begin for several days.

184.    Unless declared a vexatious litigator by this Court and placed upon filing restrictions, Krudy will continue to file lawsuits and charges against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys.

185.    Unless enjoined by this Court, Krudy will continue to file lawsuits and charges against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys.

186.    In fact, Krudy's threats and harassing conduct have increased in the past several days and leading up to the filing of his third lawsuit.

187.    On February 18, 2025, Krudy began to contact Plaintiff's attorney and Plaintiff's employees to solicit their service address.  A copy of Krudy's February 18, 2025 email to Plaintiff's employee is attached hereto as Exhibit 6.  Krudy made clear in his email that the purpose of his communication was to obtain the employee's address for purposes of serving them a copy of his third lawsuit:

> "Dear [NAME REDACTED],
>
> I am writing to ask for your confirmation of your current legal name and residential address for the purpose of legal service.

Thank you.

Sincerely,

Nicholas Krudy".

188. Krudy emailed Plaintiff's attorney, David Campbell, copied a third party that has no involvement or relation to any of the Agency Charges and Federal Lawsuits, and threatened and disparaged Mr. Campbell:

"Dear Mr. Campbell,

I was double checking some addresses in preparation for the filing of a complaint.

The Cuyahoga County Treasurer's Office is showing that you have not paid the first half of Y2024 real estate taxes in the amount of [AMOUNT REDACTED] due for [ADDRESS REDACTED].

They are due by February 20, 2025. (i.e. this Thursday)

On March 3, 2025, a 10% penalty is assessed on past due First Half 2024 Pay 2025 Real Estate Taxes. See https://cuyahogacounty.gov/treasury/pay-your-taxes/tax-collection-calendar .

Just a friendly reminder.

Warm regards,

Nicholas Krudy".

189. A true and correct copy of Krudy's February 18, 2025 email to Mr. Campbell is attached hereto as Exhibit 7.

190. Res judicata has not stopped Krudy from filing Agency Charges and lawsuits.

191. Time has not stopped Krudy's irrational focus on UH.

192. Plaintiff names as defendants and respondents to his Agency Charges and Federal Lawsuits individuals whom had no involvement whatsoever in his prior termination.

193. For example, Krudy has filed charges against UH's Chief Legal Officer.

21

194.    UH's Chief Legal Officer had no involvement whatsoever in Krudy's prior employment and termination therefrom.

195.    UH's Chief Legal Officer is not principally involved in UH's defense of the Agency Charges and Federal Lawsuits.

196.    Krudy has named UH's Chief Legal Officer as a respondent simply to harass him and harass Plaintiff.

197.    Krudy files his Agency Charges and the Second Lawsuit simply to harass Plaintiff and in an attempt to circumvent this Court.

198.    Krudy contacts Plaintiff's employees and outside counsel for the sole purpose of filing his next charge.  Krudy then uses his communications with Plaintiff as the basis for his next charge, and then uses that charge and Plaintiff's defense of that charge as the basis for filing amendments and subsequent charges.

199.    Krudy's litigation is a vicious, malicious, and intentional cycle.

200.    Any filing by Krudy at this point is barred by res judicata and/or collateral estoppel.

201.    Any filing by Krudy at this point is frivolous on its face and supports an award of sanctions against Krudy and an award of attorneys fees to Plaintiff for responding to the frivolous filing.

202.    If this Court does not identify Krudy as a vexatious litigator, UH, UH's employees, and UH's outside counsel will be defending charges and lawsuits for years to come.

203.    In response to this Complaint, Krudy will most certainly file Agency Charges alleging that he has somehow been harmed by UH asserting its rights.

## COUNT I
## <u>JUDICIAL DECLARATION</u>

204.    Plaintiff incorporates its allegations set forth in Paragraphs 1 through 203 of the Complaint as if fully rewritten herein.

205.    As set forth above, Krudy has filed more than 40 charges and amendments against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys with various state and federal agencies.

206.    Plaintiff has also filed the First Lawsuit, the Second Lawsuit, and many appeals related to the orders issued by Judge Polster and Judge Ruiz in those lawsuits.

207.    All of Krudy's Agency Charges and Federal Lawsuits are frivolous and have been filed simply to harass Plaintiff, Plaintiff's employees, and Plaintiff's attorneys.

208.    Krudy has threatened to file a third lawsuit arising out of the same allegations from the Federal Lawsuits, both of which are on appeal with the Sixth Circuit Court of Appeals.

209.    Krudy's Board charges are clearly frivolous.  The Board charges take issue with Plaintiff's representation of itself in response to Krudy's many charges and lawsuits.

210.    Unless declared a vexatious litigator, Krudy will file the threatened proposed third federal lawsuit and corresponding Ohio state court lawsuit in the coming days.

211.    Unless declared a vexatious litigator, Krudy will continue to file charges and lawsuits against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys.

212.    This Court has the ability to issue a declaratory judgment declaring Krudy to be a vexatious litigator based upon 28 U.S.C. § 1651, 28 U.S.C. § 2201, and this Court's holdings in *Conley v. Smith*, Case No. 5:08CV622, 2009 WL 5955989 (N.D. Ohio March 6, 2009); *Sumbry v. State of Indiana, et al.*, No. 4:06-cv-1322, 2006 WL 3420206 (N.D. Ohio Nov. 27, 2006); *Lomaz v. Ohio Dept. of Commerce, Div. of State Fire Marshall*, No. 5:03-cv-2609, 2005 WL 1126746 (N.D. Ohio Apr. 20, 2006).

213.    The Agency Charges are appropriately considered by this Court when reviewing the vexatious litigator classification for Krudy.

214.    Specifically, in *Riccard v. Prudential Insurance Co*., 307 F.3d 1277 (11th Cir 2002), the Eleventh Circuit addressed a plaintiff who is very similar to Krudy.  Specifically, the Eleventh Circuit found the former employee was similar obsessed with the defendant employer.  *Id.* at 1294 (The "***near obsession regarding his former employer***, injunctive means [was] the only means that offer[ed] any chance of preventing further harassment").

215.    The Eleventh Circuit found that the former employee "launched a bitter campaign against Prudential that has included the filing of four lawsuits; the filing of complaints alleging misconduct by Prudential with the Securities and Exchange Commission, the United States Attorney's Office, the Banking and Insurance Department of one state, and the Agricultural Department of another; the filing of a motion for sanctions against Prudential and some of the attorneys representing it." *Id.* at 1282.

216.    The district court in *Riccard* reasoned that "given Riccard's near-obsession regarding his former employer, injunctive relief is the only means that offers any chance of preventing further harassment of Prudential, further clogging of the judicial machinery with meritless pleadings, and further overloading of already overloaded court dockets."  *Id.* at 1295.

217.    The injunction in *Riccard* initially was worded to prohibit Riccard from filing lawsuits against Prudential. *Id.* at 1285. However, following the injunction, Riccard began to file numerous complaints against Prudential with various federal agencies in an attempt to circumvent the injunction and continue his harassment. *Id.*

218.    Prudential filed a motion for contempt and a motion to expand the injunction to prohibit Riccard from filing in any forum against Prudential and Prudential's agents and attorneys.

24

*Id.* at 1285. The District Court granted the motions, found Riccard to be in contempt, expanded the injunction, and awarded Prudential its attorneys' fees.

219. The expanded injunction in *Riccard* prohibited the former employee and anyone acting on his behalf from "filing any action, complaint, claim for relief, suit, controversy, cause of action, grievance, writ, petition, accusation, charge or any similar instrument ... against Prudential, its present, former or future agents, representatives, employees, directors, officers, attorneys, parents, assigns, predecessors or successors ..., in any court, forum, tribunal, self-regulatory organization or agency (including law enforcement), whether judicial, quasi-judicial, administrative, federal, state or local, including Bar disciplinary and/or grievance committees ... whether for pecuniary advantage or otherwise, without first obtaining leave of this Court.... This lawsuit and the lawsuit captioned *Riccard v. Prudential Insurance Co. of Am.,* Case No. 6:99–CV– 1266–ORL–31KRS, and any appeals from those suits, are the only Actions exempted from this Order." *Id.* at 1298.

220. In explaining why the injunction needed to be expanded, the district court pointed out that since the injunction was originally issued, Riccard had "expanded his sights to include not only Prudential, but its attorneys" as evidenced by his filing of ethical grievances with the Florida and New York Bar Associations. There was also every reason to believe that Riccard might seek other innovative ways to evade or circumvent the injunction, so the court attempted to foreclose as many of them as possible by broadening the injunction." *Id.* at 1298.

221. The Eleventh Circuit reasoned that the injunction that required pre-review of any charges or lawsuits was appropriate so the former employee could not take to carry out his vendetta against Prudential and those associated with it. *Id.* at 1299.

222.     In relying upon the he Sixth Circuit Court of Appeals' holding in *Filipas v. Lemons,* 835 F.2d 1145, 1146 (6th Cir.1987), the Eleventh Circuit confirmed that "A vexatious litigant does not have a First Amendment right to abuse official processes with baseless filings in order to harass someone to the point of distraction or capitulation."

223.     Krudy has the same vendetta as the plaintiff in *Riccard*.

224.     Krudy has similarly attached UH's attorneys as the plaintiff in *Riccard*.

225.     Krudy has similarly utilized charges to harass his former employer as the plaintiff in *Riccard*.

226.     Plaintiff, therefore, is entitled to a judicial declaration that Krudy is a vexatious litigator and should be placed through a screening process prior to filing any lawsuits and/or charges against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys.

## COUNT II
## PRELININARY AND PERMANENT INJUNCTION

227.     Plaintiff incorporates its allegations set forth in Paragraphs 1 through 226 of the Complaint as if fully rewritten herein.

228.     As set forth above, Krudy has filed more than 40 charges and amendments against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys with various state and federal agencies.

229.     Plaintiff has also filed the First Lawsuit, the Second Lawsuit, and many appeals related to the orders issued by Judge Polster and Judge Ruiz in those lawsuits.

230.     All of Krudy's Agency Charges and Federal Lawsuits are frivolous and have been filed simply to harass Plaintiff, Plaintiff's employees, and Plaintiff's attorneys.

231.     Krudy has threatened to file a third federal lawsuit and corresponding Ohio state court lawsuit arising out of the same allegations from the Federal Lawsuits, both of which are on appeal with the Sixth Circuit Court of Appeals.

26

232.    Unless enjoined by this Court, Krudy will file the threatened proposed third federal lawsuit and corresponding Ohio state court lawsuit in the coming days.

233.    Unless enjoined by this Court, Krudy will continue to file charges and lawsuits against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys.

234.    This Court has the ability to issue an injunction requiring Krudy to obtain leave from the Court prior to filing any lawsuits against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys based upon 28 U.S.C. § 1651, and the holdings in *Conley v. Smith*, Case No. 5:08CV622, 2009 WL 5955989 (N.D. Ohio March 6, 2009); *Sumbry v. State of Indiana, et al.*, No. 4:06-cv-1322, 2006 WL 3420206 (N.D. Ohio Nov. 27, 2006); *Lomaz v. Ohio Dept. of Commerce, Div. of State Fire Marshall*, No. 5:03-cv-2609, 2005 WL 1126746 (N.D. Ohio Apr. 20, 2006); *Filipas v. Lemons*, 835 F.2d 1145 (6th Cir.1987); *Wrenn v. Vanderbilt Univ. Hosp.*, Nos. 94-5453, 94-5593, 1995 WL 111480 (6th Cir. Mar. 15, 1995); *Riccard v. Prudential Insurance Co.*, 307 F.3d 1277, 1294 (11th Cir 2002).

235.    Plaintiff, therefore, is entitled to a preliminary and permanent injunction against Krudy from filing lawsuits and/or charges against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys without prior leave of this Court.

236.    The injunction should provide that Krudy, or anyone on his behalf, shall be prohibited from filing any action, complaint, claim for relief, suit, controversy, cause of action, grievance, writ, petition, accusation, charge or any similar instrument against University Hospitals Cleveland Medical Center, its present, former or future agents, representatives, employees, directors, officers, attorneys, parents, assigns, predecessors or successors, related entities, members, or insurers, in any court, forum, tribunal, self-regulatory organization or agency (including law enforcement), whether judicial, quasi-judicial, administrative, federal, state or

local, including Bar disciplinary and/or grievance committees whether for pecuniary advantage or otherwise, without first obtaining leave of this Court.

**COUNT III**
**TEMPORARY RESTRAINING ORDER**

237.    Plaintiff incorporates its allegations set forth in Paragraphs 1 through 236 of the Complaint as if fully rewritten herein.

238.    As set forth above, Krudy has filed more than 40 charges and amendments against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys with various state and federal agencies.

239.    Plaintiff has also filed the First Lawsuit, the Second Lawsuit, and many appeals related to the orders issued by Judge Polster and Judge Ruiz in those lawsuits.

240.    All of Krudy's Agency Charges and Federal Lawsuits are frivolous and have been filed simply to harass Plaintiff, Plaintiff's employees, and Plaintiff's attorneys.

241.    Krudy has threatened to file a third federal lawsuit and corresponding Ohio state court lawsuit arising out of the same allegations from the Federal Lawsuits, both of which are on appeal with the Sixth Circuit Court of Appeals.

242.    Krudy is expected to file his new, threatened lawsuits prior to February 23, 2025.

243.    Unless this Court issues a temporary restraining order, Krudy will file the threatened proposed third federal lawsuit and corresponding Ohio state court lawsuit in the coming days.

244.    Unless this Court issues a temporary restraining order by this Court, Krudy will continue to file charges and lawsuits against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys during while this matter remains pending.

245.    This Court has the ability to issue an injunction requiring Krudy to obtain leave from the Court prior to filing any lawsuits against Plaintiff, Plaintiff's employees, and Plaintiff's

attorneys based upon 28 U.S.C. § 1651, and the holdings in *Conley v. Smith*, Case No. 5:08CV622, 2009 WL 5955989 (N.D. Ohio March 6, 2009); *Sumbry v. State of Indiana, et al.*, No. 4:06-cv-1322, 2006 WL 3420206 (N.D. Ohio Nov. 27, 2006); *Lomaz v. Ohio Dept. of Commerce, Div. of State Fire Marshall*, No. 5:03-cv-2609, 2005 WL 1126746 (N.D. Ohio Apr. 20, 2006); *Filipas v. Lemons*, 835 F.2d 1145 (6th Cir.1987); *Wrenn v. Vanderbilt Univ. Hosp.*, Nos. 94-5453, 94-5593, 1995 WL 111480 (6th Cir. Mar. 15, 1995); *Riccard v. Prudential Insurance Co.*, 307 F.3d 1277, 1294 (11th Cir 2002).

246.     Plaintiff, therefore, is entitled to a temporary restraining order against Krudy from filing lawsuits and/or charges against Plaintiff, Plaintiff's employees, and Plaintiff's attorneys without prior leave of this Court

WHEREFORE, Plaintiff demands judgment and relief against Krudy as follows:

1.  A judicial declaration that Krudy is a vexatious litigator;

2.  A judicial declaration prohibiting Krudy, or anyone on his behalf, from filing any action, complaint, claim for relief, suit, controversy, cause of action, grievance, writ, petition, accusation, charge or any similar instrument against University Hospitals Cleveland Medical Center, its present, former or future agents, representatives, employees, directors, officers, attorneys, parents, assigns, predecessors or successors, related entities, members, or insurers, in any court, forum, tribunal, self-regulatory organization or agency (including law enforcement), whether judicial, quasi-judicial, administrative, federal, state or local, including Bar disciplinary and/or grievance committees whether for pecuniary advantage or otherwise, without first obtaining leave of this Court.

3.  Reasonable attorneys' fees;

4.  Costs incurred in prosecuting this action; and

5.  Any other appropriate relief that this Court deems just and equitable.

                                  Respectfully submitted,

                                  */s/ David A. Campbell*

                                  David A. Campbell (0066494)
                                  Donald G. Slezak (0092422)
                                  Y. Timothy Chai (0092202)
                                  Gordon Rees Scully Mansukhani, LLP
                                  600 Superior Ave., East
                                  Suite 1300
                                  Cleveland, OH 44114
                                  Phone: (216) 302-2531
                                  Fax: (216) 539-0026
                                  Email: dcampbell@grsm.com
                                  dslezak@grsm.com
                                  tchai@grsm.com

                                  *Attorneys for Plaintiff*